UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

EMMA HOWLAND-BOLTON,

                    Plaintiff,                Case No.
                                                  Hon.

v.

DETROIT PUBLIC SCHOOLS
COMMUNITY DISTRICT,

                    Defendant.

_____

Amanda M. Ghannam (P83065)
AMG Legal PLLC
3200 Greenfield Rd., Suite 300
Dearborn, MI 48128
(313) 315-5327
amanda@amglegalcounsel.com
Attorney for Plaintiff

_____

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff, Emma Howland-Bolton, through her counsel, AMG Legal PLLC,

brings this complaint pursuant to the First Amendment to the U.S. Constitution, 42

U.S.C. §1983 and the Michigan Whistleblowers' Protection Act as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiff, Emma Howland-Bolton, is a resident of Detroit, Michigan, a

lifelong educator, and a proud employee of the Detroit Public School Community

1

District, where she has worked as a certificated, tenured teacher at Thirkell Elementary School for the past six years.

2.   Defendant, the Detroit Public School Community District, is a public school district created by the Michigan Legislature in 2016.

3.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(e) because the events giving rise to this cause of action occurred in Detroit, Wayne County, Michigan, within this judicial district, Plaintiff resides within this judicial district, and Defendant operates within this judicial district.

4.   This Court has general federal question jurisdiction pursuant to 28 U.S.C. §1331, which authorizes federal courts to decide cases concerning federal questions, and 28 U.S.C. §1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases such as those arising under the U.S. Constitution.

5.   Supplemental jurisdiction over Plaintiff's state law claims is appropriate pursuant to 28 U.S.C. §1367 as they arise from the same case and controversy.

**STATEMENT OF FACTS**

6.   Plaintiff, Emma Howland-Bolton, is an exemplary schoolteacher at the Detroit Public Schools Community District ("DPSCD").

7.   Ms. Howland-Bolton has taught fourth and fifth grade at DPSCD without interruption for the past sixteen years. She has a professional teaching

certificate in Elementary (meaning she is certified to teach all subjects in kindergarten through fifth grade) and an endorsement in Social Studies. She has always received performance ratings of "highly effective" and "effective", and has meaningfully contributed to every DPSCD school she has worked at.

8. Ms. Howland-Bolton has taught at DPSCD's 111-year-old Thirkell Elementary-Middle School ("Thirkell") since 2020.

9. Thirkell is located near the intersection of Rosa Parks and West Grand Boulevard in the city of Detroit, near the Henry Ford Hospital complex.

10. Ms. Howland-Bolton is deeply and meaningfully invested in the success of Thirkell and its students.

11. Ms. Howland-Bolton bought a house within walking distance of Thirkell and regularly walked or biked to school. She planned to work at Thirkell for at least the next 30 years and eventually retire from Thirkell.

12. In addition to being an excellent teacher, Ms. Howland-Bolton is personally dedicated to the wellbeing of her students and the greater community in which she lives and works and spends a lot of her free time engaged in activities dedicated to the betterment of that community.

13. For example, Ms. Howland-Bolton has created community food and flower gardens at Thirkell and in her neighborhood, serves as the secretary of her Virginia Park block club, organizes service days in the neighborhood, organized a

successful effort to install a radar speed sign outside Thirkell to improve safety for students who walk to school, serves as a neighborhood precinct delegate, and serves as the Teacher in Residence at Michigan State University's Kellogg Biological Station.

14.     She also got a mobile library donated to Thirkell, installed a native pollinator garden and pond, stopped basement flooding at the school with the installation of a 200-square-foot rain garden, recruited volunteers to dedicate hundreds of hours of service to Thirkell, created a Green Schoolyard Strategic Plan and has obtained thousands of dollars' worth of books, supplies, and grants for the school.

**Ms. Howland-Bolton Attempts to Organize a PTA Meeting, Uncovers Misappropriation of Federal Funds, and is Detained in the Principal's Office and Issued a Pretextual Disciplinary Reprimand; Defendant Shuts Down Nascent PTA Organization**

15.     In the fall of 2024, Ms. Howland-Bolton, working with other Thirkell teachers and parents, began efforts to organize a PTA (Parent-Teacher Association) to advocate for improved learning conditions, infrastructure improvements, solutions to problems such as leaks in the school's roof, and additional fundraising to bring more resources to their school.

16.     Ms. Howland-Bolton and the group sought and advocated for, among other things, updated play equipment, a Family Resource Room, a washer and dryer that would be available for Thirkell families to use, a Calm Room with noise-

canceling headphones and other resources for students both with and without Autism Spectrum Disorder to use, more consistency and transparency with student discipline, and more resources for school counselors to better provide student support.

17.   Around this time, Ms. Howland-Bolton began to ask questions regarding funds that had been provided to DPSCD through Title 1 of the Elementary and Secondary Education Act to provide aid to school districts serving lower-income and disadvantaged students. The purpose of Title 1 funds (and the ESEA) is to strengthen and improve educational quality and educational opportunities in elementary and secondary schools.

18.   Ms. Howland-Bolton and the PTA organizers uncovered what they believed to be misappropriation of Title 1 funds.

19.   On or about February 11th, 2025, the nascent PTA held a meeting at Thirkell at which it planned to hold elections for its first officers.

20.   Preventing the PTA from electing officers and beginning its advocacy, representatives from the Michigan PTA and the DPSCD School Board came to the PTA meeting and dismantled the budding organization.

21.   Meanwhile, Thirkell's principal, Felicia Coleman Jones, and assistant principal, Regina Isaac, detained Ms. Howland-Bolton in the principal's office by

closing the door, standing in front of it, and telling her that if she left, they would call the police.

22.     Principal Coleman Jones and Assistant Principal Isaac kept Ms. Howland-Bolton in the office until the PTA meeting had been shut down.

23.     On February 26, 2025, Principal Coleman Jones then issued Ms. Howland-Bolton a written reprimand falsely accusing her of displaying "unprofessional behavior" and "creating an unprofessional and hostile atmosphere for the school administrator, district representatives, and leadership."

24.     The PTA organization Ms. Howland-Bolton and her colleagues had spent the last six months building was shut down.

25.     Principal Coleman Jones threatened Ms. Howland-Bolton that if she continued organizing, she would be forced to teach middle school instead of fourth and fifth grade.

26.     This transpired after the union election. Despite showing 100% student growth on her teaching metrics, in June 2025, Ms. Howland-Bolton learned that she would be moved out of her fourth-grade classroom and forced to teach middle school science, which she is not formally certified to teach. She began teaching sixth, seventh, and eighth grade science beginning in the 2025-2026 academic year.

**Ms. Howland-Bolton Continues to Question School Officials About Missing Title One Funds Throughout 2025-2026 Academic Year**

27.   On October 23, 2025, Ms. Howland-Bolton emailed Principal Coleman Jones, Assistant Principal Regina Isaac, and DPSCD Dean of Climate and Culture Terrell England the following message with the subject line "Title One Follow Up Questions":

*Hi All,*

*Many parents couldn't make the Title One meeting held last night, in part because so little notice was given.*

*I was given a flyer to hand out on Monday for an event on Wednesday. The notice posted on our school class dojo page went up less than 24 hours before the meeting.*

***According to Federal Law, the school has to meet the requirement that it "informs all parents and makes a good faith effort to encourage their attendance." I don't feel we met that requirement.***

*We've traditionally had Title One meetings at PTC or Open House when many parents are going to be in the building anyway, to increase involvement.*

*Since only 3 parents were able to make the meeting, it might be worth considering advertising earlier and attaching the meeting to another school-based event as we've historically done.*

***Additionally, per Federal Law, low Title One meeting turn-out triggers the requirement that we "evaluate the effectiveness of our parent involvement program" and that we "identify and address barriers to involvement."***

*Before I send out the notes to the parents who couldn't make it, I have some follow up questions. I want to make sure I'm sending out correct and up to date information about the Federal funds available at Thirkell.*

7

*1.) **Who are the PTA officers?** I know they didn't come to the meeting (though it was advertised they would be there on the flyer), but I was surprised that no one who did come was able to share the full names of our PTA officers. Does anyone know their names? Contact information? When they meet? How to join?*

*2.)  **What is our Title One budget for this year?** Is it the same $144,579 that we got last year? Last year there was a slide with this information, but I didn't see it in the slide deck this year.*

*3.) Speaking of last year, do we have the budget from last year? **What did we spend our 2024-25 Title One funds on?***

*4.) I know you said that parents can access the funds for field trips, technology, etc... but it might help to have examples of how the money has been spent in the past. **Are parents able to access last year's budget?***

*5.) **If parents have ideas on how the Title One money can be spent, what's their next step to access funds?***

*6.) I'm so excited to hear that room 205 is now the parent resource room, and that parents can access it at any time! **What resources are in the parent resource room?** Are parents also able to access the washer and dryer at Thirkell? The parent resource room is right across the hall.*

*7.) Is the therapist who uses that room going to use another room because of the breech [sic] of confidentiality meeting with students in a multi-use room poses? **Do we have another space for the therapist to meet with students that isn't the parent resource room?***

*8.) We put a sign up for the parent resource room so parents would know it was there and it has already been taken down, less than 24 hours later. **When will the parent resource room door sign be put back up?***

*9.) **How are we letting parents know about the existence of the new parent resource room?***

8

*10.) Since our Parent Teacher organization was forcibly disbanded, and the one the principal created doesn't appear to be active, and since we don't have an SAC,* ***how was the expenditure of Title One funds determined last year without the input of parents?***

*11.)* ***When is the next Title One meeting?***

*I'll wait to share the notes from this meeting with parents until I hear back.*

*Thank you!* [emphasis in original]

28. Principal Coleman Jones provided a one-word reply: "Received!" and did not answer any of Ms. Howland-Bolton's questions.

29. Ms. Howland-Bolton followed up seeking answers to her questions on October 28, 2025, but received no substantive response.

30. Meanwhile, throughout October 2025, Ms. Howland-Bolton also contacted the Michigan Department of Education to inquire about the legality of Defendant forcing her to teach middle school science outside her certification despite the fact that there was another science teacher at Thirkell, and if she could be released from a potentially unfair evaluation while being forced to teach a subject and grade level that she did not have the certification to teach.

31. On October 28, 2025, Ms. Howland-Bolton emailed DPSCD's Inspector General, Bernadette Kakooza, to report potential misuse of Title 1 funds and failure to comply with Title 1's requirements at Thirkell, including the lack of

9

an active school advisory board or parent organization and the opaque expenditure of approximately $150,000 in annual Title One funds.

32.     Ms. Howland-Bolton's email stated in part:

*There are more details below but essentially, our school regularly runs out of paper and pencils. We're encouraged by our administration to use our school specialty money to buy basic essentials. And yet we receive Title One funds (last year, around $150,000) which are supposed to go towards supporting "Student Achievement." Our school has rooms that are full to bursting with supplies that are never distributed to students, and yet, we are told we have to purpose our own supplies for our classrooms using school specialty or our own funds. Doing my due diligence I am reporting to you the possible misuse of title one funds at my school and more broadly.*

33.     Inspector General Kakooza responded, stating she found the concerns valid, and suggesting Ms. Howland-Bolton contact Defendant's Title One budget administrator, Londre Gilkey, and Defendant's Office of Schools Director, Willie Wood.

34.     Ms. Howland-Bolton forwarded her Title One questions to Mr. Gilkey, noting that the school regularly ran out of basic supplies while apparently sitting on $150,000 in annual Title One funds.

35.    On October 29, 2025, Mr. Gilkey responded to Ms. Howland-Bolton, suggesting the school improvement team "discuss these issues and work internally to find resolutions to these concerns."

36.    Ms. Howland-Bolton thanked Mr. Gilkey for his response and reiterated several specific questions ostensibly within his purview as Title 1 budget administrator, asking where to find the Title 1 budget for the current year, how to find out what the prior year's Title 1 budget was spent on, and how Title One funds were being spent without parent input given the absence of a school advisory board or parent organization.

37.    Mr. Gilkey did not reply.

38.    Ms. Emma Howland-Bolton also contacted Willie Wood; he did not respond.

39.    Ms. Howland-Bolton updated Inspector General Kakooza on the response (or lack thereof) she had received from Mr. Gilkey and Mr. Wood. Inspector General Kakooza responded by directing her to a budget planning guidelines document on the district's Hub portal.

40.    No one ever answered Ms. Howland-Bolton's specific questions about the potentially missing or misused Title 1 funds.

**Ms. Howland-Bolton Raises Questions About Missing Funds from a National Wildlife Federation Grant**

41. On January 26, 2026, Ms. Howland-Bolton emailed Inspector General Kakooza, Principal Coleman Jones, Defendant's Assistant Superintendent Tammy Mitchell, Defendant's Chief Academic Officer Leenet Campbell-Williams, Thirkell school Secretary Ms. Henderson, Defendant's Compliance Department, and Defendant's Accounts Payable Department to report the following:

*Hi All,*

*Thirkell participates in the EcoSchool program in partnership with the National Wildlife Federation and GM. Last year, we were awarded a grant for $750.*

*Our school secretary, Ms. Henderson (cc-ed here as Sandra Barbee) deposited the $750 check into the Thirkell account and I sent her the list of items that were approved by EcoSchools and Thirkell Admin for her to purchase with the grant.*

*For some reason Ms. Henderson has refused to order the supplies that were approved, insisting that the approved items can only be purchased with a physical check. This is not a requirement that any other EcoSchools participant has had to contend with. At every other school, the school secretary simply deposited the check from grant into the school account (which Ms. Henderson has done) and then ordered the approved items (which Ms. Henderson refuses to do).*

*It has now been almost a full calendar year, and we are now out of compliance with the grant, and critically, haven't gotten the supplies that we need.*

*Because Ms. Henderson insisted I needed to use a physical check, I completely redid the order for a Home Depot purchase since they are one of the few companies that still take checks. Ms. Henderson insisted that I needed to go in person to the Home Depot in Troy to order the approved items and pay for them with a check. I attempted to do this even though even the Home Depot employees were confused about why Ms. Henderson didn't simply order the items online. However, despite*

*multiple time-consuming attempts on the part of several (very helpful) Home Depot employees, the check was denied.*

*I have done everything I can do to satisfy the needs of the grant but at this point Ms. Henderson needs to either make the order herself or return the money to the National Wildlife Federation.*

*I'm not sure why this has been so complicated, but it seems odd that it has taken over a year, and we are no closer to spending the NWF grant money. The items were approved, the check from the grant was deposited in the Thirkell account, now that money just needs to be spent on the approved items.*

*This is above my paygrade, but if someone can support Ms. Henderson in either ordering the items or returning the money, that would be great. I don't think it looks very good to return the grant money, especially for a program that is ongoing, but I am uncomfortable with the money just sitting in the Thirkell account.*

*The situation with the NWF grant fits a larger pattern at Thirkell where we have resources to address needs -*

- *we have rooms full of supplies, for instance, that never get distributed to teachers and students*
- *we routinely run out of paper, pencils, and printer ink and are encouraged to cover those basic items with our school specialty money even though other DPSCD schools simply provide those items to teachers and students as a matter of course*
- *students are suspended for being out of uniform when we have uniform pieces in the building we could give to students instead of punishing them for something outside of their control*
- *And, in the instance I've just shared, we have a grant that covers needed supplies but Ms. Henderson will not disburse it*

*for some reason, those resources never get where they're going.*

*Having now completed the mandatory district training on fraud and waste, I think an investigation into Thirkell is probably in order. I will say it's incredibly unclear who to email about issues of this nature*

13

*because all of the pages relating to contacting folks at DPSCD or the office of procurement are now 404 -page not found.*

42.     On January 27, 2026, Inspector General Kakooza replied to Ms. Howland-Bolton, advising that she would follow up on the matter and requesting written documentation of the grant and its terms; the two exchanged several emails in which Ms. Howland-Bolton provided clarifying information about the NWF grant, including that the check was dated March 12, 2025, and that approved items had never been purchased.

43.     Meanwhile, too, on January 28, 2026, Ms. Howland-Bolton emailed Inspector General Kakooza following up on their October 2025 conversation regarding Ms. Howland-Bolton's unanswered Title One questions.

44.     She stated that she was unable to find the previous year's Title 1 budget, that none of the people Inspector General Kakooza suggested she contact had provided the budget, and that the documents Inspector General Kakooza referred her to did not contain any information on how the money in the Title 1 budget was actually spent.

45.     She asked again: "What did Thirkell spend our Title One budget on last year?"

**Days After Ms. Howland-Bolton Raises Concerns of Fraud and Misuse of Funds, Defendant Subjects Ms. Howland-Bolton to a Retaliatory Involuntary Transfer**

14

46.     On January 30, 2026, just two days after bringing her concerns of Title 1 funding mismanagement back to Inspector General Kakooza's attention, Ms. Howland-Bolton received an email from Defendant's Human Resource Manager and Program Supervisor, Lillian Bernal, informing her that she was being involuntarily transferred away from Thirkell to Mann Elementary School, effective later that week.

47.     Mann Elementary School is located approximately ten miles away from Thirkell, near the intersection of Plymouth Road and Evergreen in far west Detroit.

48.     Ms. Howland-Bolton, believing the transfer to be in retaliation for her reports of fraud, contacted Inspector General Kakooza, Superintendent Nikolai Vitti, Defendant's Human Resources Department, and others to protest the retaliatory involuntary transfer and request to stay at Thirkell.

49.     Hundreds of community members also emailed district administrators to protest the transfer and request that Ms. Howland-Bolton be allowed to stay at her neighborhood school, to no avail.

50.     On February 5, 2026, Ms. Howland-Bolton's involuntary transfer to Mann Elementary became effective.

51.     While teaching at Thirkell, Ms. Howland-Bolton could walk to school each day; now, at Mann, her commute is approximately a twenty-five-minute drive on the highway, and she does not currently have a reliable car.

52.     The mid-year transfer, right before MSTEP testing, was incredibly disruptive to Ms. Howland-Bolton's students at Thirkell, who haven't had a consistent science teacher for the past six years and who have had a series of inconsistent substitute teachers since Ms. Howland-Bolton was forced to leave. The ongoing disruption to her students during the days following the involuntary transfer included students in tears asking Ms. Howland-Bolton if she was being fired or quitting teaching, students being pulled from class, students held in the auditorium with no explanation, an active ceiling leak in a classroom, and deteriorating classroom conditions.

53.     Defendant is still requiring Ms. Howland-Bolton to teach sixth, seventh, and eighth-grade science, which is outside of her certification.

54.     Teaching outside her certification could lead to negative impacts on Ms. Howland-Bolton's lifelong career as an educator, including but not limited to unfair or negative evaluations and issues with certification renewal, and tenure status.

**Defendant Fails to Meaningfully Investigate Fraud or Retaliation Concerns**

55.     Throughout February of 2026, Ms. Howland-Bolton continued to request that Inspector General Kakooza conduct an investigation into the retaliation she had experienced and reiterate her questions about how the NWF grant money and the district's Title 1 funds were spent.

56.     Defendant has failed to meaningfully investigate either Ms. Howland-Bolton's reports of fraud and misuse of funds or her report of retaliation.

57.     Inspector General Kakooza's "investigation" seemed to have several significant gaps. For example, she asked Ms. Howland-Bolton for copies of documentation relevant to the NWF grant, because she didn't think Defendant would provide them. Ms. Howland-Bolton expressed concern at the apparent lack of any mechanism to compel the production of important documents and evidence in fraud investigations, to no avail.

58.     Inspector General Kakooza concluded that there had been no wrongdoing with respect to the missing NWF grant money without informing Ms. Howland-Bolton any meaningful update into her investigation.

59.     In fact, Inspector General Kakooza specifically refused to provide information, writing: "I do not have to tell you who or what I obtained in the investigations, but what I can tell you, as anybody else, I conducted thorough investigations, and stand by the results. Now, I would appreciate it if you could stop sending me constant emails questioning the conduct of OIG investigations."

60.     Ms. Howland-Bolton did not hear anything about any investigation into her retaliation claim with Inspector General Kakooza until after she heard that Superintendent Vitti had informed members of the public that an investigation would occur.

61. To Ms. Howland-Bolton's knowledge, Inspector General Kakooza's "investigation" into her complaint of retaliation consisted simply of asking the principal if the involuntary transfer had been retaliatory and accepting it when the principal said "no." The investigation was opened and closed within two days.

62. To this day, Defendant has not answered any of Ms. Howland-Bolton's questions about the NWF grant money or how the school's Title 1 funds were spent.

**Defendant Bans Ms. Howland-Bolton from the Thirkell Elementary Gardens**

63. On February 23, 2026, Ms. Howland-Bolton sent an email to Defendant's administrators, including but not limited to Superintendent Nikolai Vitti, describing her commitment to and progress in the Thirkell community gardens, particularly her efforts to support students in carrying out a tree planting ceremony and dedication in remembrance of two young students who had tragically passed away. She wrote:

> *It was important for students to have the opportunity to talk about their friends and classmates who had passed away, and to create a physical space they could return to to remember them. Caring for these young fruit trees, watering them, staking them up, fertilizing them, and tracking their growth gave students a chance to process their grief while helping something grow.*

> *The garden has always been an important place for children, staff, and community to learn and grow (food and ourselves) but it wasn't until we planted the trees for Erek and KaeShawn that I saw it was also an important space for students to grieve and remember too… For the last several years we have been trying to get commemorative benches next to [the students'] trees…*

18

*... Based on the clearly retaliatory nature of my involuntary transfer I am worried that I and my fellow teachers will not be allowed to continue our after-school garden club, The "Keep Growing Club."*

*Already I can see on my daily dog walk past the school that the drains that should be leading into the middle of our 200 square foot rain garden have been detached. This rain garden has successfully prevented flooding in our basement classrooms since its installation. A benefit to living in the neighborhood is that I, and other neighbors and community members have been able to care for the gardens over breaks, including the summer break to continue the work the students start in the spring.*

*I'm concerned that even if we get KaeShawn and Erek's commemorative benches donated now, we will not be allowed to install them on the Thirkell grounds next to their trees. These students deserve to be memorialized and their classmates and loved ones deserve a space to remember them too....*

1. *Can you assure me that I will be allowed to continue maintaining our school gardens and memorials in collaboration with my former colleagues and the Thirkell Keep Growing Club?*

2. *Will we still be allowed to install our commemorative benches for Erek next to his apple tree, and KaeShawn next to his cherry tree?*

3. *Will I be allowed to continue advocating for the Thirkell Green Schoolyard Plan?*

64.     Superintendent Vitti responded that another staff member would serve as the School Garden Lead, but he did not answer Ms. Howland-Bolton's questions about whether Defendant would address her concerns and permit her continued involvement.

19

65.   When Ms. Howland-Bolton reiterated her questions, Superintendent Vitti replied: "Additional involvement from former staff members is not necessary… Your help is not needed at this time."

66.   This was obviously not true, as several Thirkell staff, parents, and neighbors had already contacted Ms. Howland-Bolton to request her help and express their concern for the gardens in the weeks following her retaliatory involuntary transfer.

67.   After six years of dedication to cultivating food and flower gardens, commemorative trees and benches, and green spaces for students to enjoy, Ms. Howland-Bolton has been banned from working in the gardens since being forced to leave Thirkell in February 2026.

**COUNT I**
**First and Fourteenth Amendments to the U.S. Constitution**
**(Retaliation for Exercise of Free Speech)**
**42 U.S.C. §1983**

68.   Plaintiff incorporates the preceding allegations as if fully restated herein.

69.   The First Amendment of the United States Constitution, incorporated to the states through the Fourteenth Amendment, prevents governmental bodies from abridging an individual's freedom of speech and protects individuals from retaliation for exercising their freedom of speech.

20

70.     Plaintiff engaged in activity protected by the First Amendment by her conduct described herein, including but not limited to her efforts to organize a PTA; her speech regarding alleged misuse of Title I funds; her speech regarding alleged misuse of grant money; her speech regarding missing funding for infrastructure improvements; and all other such speech protected by the First Amendment.

71.     Plaintiff's speech was made in her capacity as a private citizen on a matter of public concern and was not done pursuant to her daily job responsibilities.

72.     Defendant retaliated against Plaintiff by its conduct described herein, including but not limited to involuntarily transferring her from a school in her neighborhood to a school located on the other side of the city in the middle of the school year and barring her from working in the garden at her former school.

73.     But for Plaintiff's constitutionally protected speech, Defendant would not have subjected her to such actions.

74.     Defendant's conduct would, did, and can reasonably be expected to chill and deter people of reasonable firmness from participating in activity protected by the First Amendment.

**COUNT II**
**First and Fourteenth Amendments to the U.S. Constitution**
**(Violation of Right to Freedom of Association)**
**42 U.S.C. §1983**

75.     Plaintiff incorporates the preceding allegations as if fully restated herein.

21

76.     The First Amendment of the United States Constitution, incorporated to the states through the Fourteenth Amendment, prevents governmental bodies from interfering with individuals' right to associate for the purposes of engaging in activities protected by the First Amendment, e.g., speech, assembly, and petition for redress of grievances.

77.     Plaintiff engaged in activity protected by the First Amendment by her conduct described herein, including but not limited to her efforts to organize a PTA and associate with parents, teachers, students, and others in the District for the purpose of discussing and organizing around matters of public concern to the DPSCD, Thirkell Elementary, and Virginia Park community.

78.     Defendant interfered with Plaintiff's First Amendment-protected right to freedom of association by its conduct described herein, including but not limited to shutting down the Parent Teacher Association that Plaintiff and her colleagues attempted to organize, threatening to retaliate against Plaintiff for her protected speech and organizing efforts, and retaliating against Plaintiff for her protected speech organizing efforts.

79.     Defendant's conduct would, did, and can reasonably be expected to chill and deter people of reasonable firmness from participating in activity protected by the First Amendment.

## COUNT III
### Violation of the Michigan Whistleblowers' Protection Act

22

**M.C.L. §15.361 et seq.**

80.    Plaintiff incorporates the preceding allegations as if fully restated herein.

81.    At all relevant times, Plaintiff was an employee, and Defendant was her employer, covered by and within the meaning of the Whistleblowers' Protection Act, MCL §15.361 et seq.

82.    Defendant violated the Whistleblowers' Protection Act when it discriminated and retaliated against Plaintiff as described herein regarding the terms, benefits, conditions, and privileges of her employment because Plaintiff reported a violation or suspected violation of a law, regulation, or rule of the State of Michigan and opposed practices made illegal by the laws, regulations, or rules of the State of Michigan.

83.    The actions of Defendants were intentional and motivated by Plaintiff's conduct protected by the Whistleblowers' Protection Act.

**DAMAGES**

84.    As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to, loss of earnings; loss of career opportunities; mental and emotional distress; loss of reputation and esteem in the community; and loss of the ordinary pleasures of everyday life.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**RELIEF REQUESTED**

Wherefore, Plaintiff Emma Howland-Bolton respectfully requests this Honorable Court grant the following relief:

- Award Plaintiff compensatory damages in whatever amount Plaintiff is found to be entitled to.

- Award Plaintiff exemplary damages in whatever amount Plaintiff is found to be entitled to.

- Award Plaintiff a judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled to.

- Award Plaintiff nominal damages for violation of her constitutional rights.

- Award Plaintiff interest, costs, and reasonable attorney fees.

- Issue an order reinstating Plaintiff to the position she would have held at Thirkell Elementary had there been no discrimination or retaliation.

- Issue an injunction prohibiting any further acts of retaliation or discrimination.

- Award Plaintiff all such other relief as may be available under applicable law and as this Court deems just and proper.

Respectfully submitted,

24

By: /s/ *Amanda M. Ghannam*

Amanda M. Ghannam (P83065)
AMG Legal PLLC
3200 Greenfield Rd., Suite 300
Dearborn, MI 48120
(313) 315-5327
amanda@amglegalcounsel.com
Counsel for Plaintiff

Dated: April 30, 2026